# Supreme Court of Texas

No. 19-0793

Virginia Angel, Trustee for the Gobsmack Gift Trust, as Assignee of South State Bank, and South State Bank, N.A.,

*Petitioners*,

v.

Kyle Tauch,

*Respondent*

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

**Argued September 15, 2021**

JUSTICE DEVINE delivered the opinion of the Court.

Justice Lehrmann did not participate in the decision.

Offer and acceptance are essential elements of a valid and binding contract. As a matter of blackletter law, an offer empowers the offeree to seal the bargain by accepting the offer.[1] But equally well-established is the rule that acceptance is ineffective to form a binding contract if the

---

[1] RESTATEMENT (SECOND) OF CONTRACTS §§ 35, 36 (Am. Law Inst. 1981).

power of acceptance has been terminated, such as by the offeror's revocation before acceptance.[2] The main issue in this contract dispute is whether a purported offer to settle a debt for a reduced sum was accepted before it was revoked. Resolution of that issue turns on the parameters of the recognized, but rarely implicated, doctrine of implied revocation.

In the mid-twentieth century, we adopted the implied-revocation doctrine in *Antwine v. Reed*, which held that an outstanding offer for the sale of land was revoked when the offeree learned that the offeror had engaged in "some act inconsistent" with the offer.[3] Since then, the doctrine has never again been invoked in this Court, and questions exist about whether and how it applies beyond the facts of the seminal case. Here, the parties dispute whether the implied-revocation doctrine (1) is limited to offers involving the sale of land, (2) applies if the offeree learns about the offeror's inconsistent act from someone other than the offeror, and (3) is satisfied under the undisputed facts in this case. We hold that the doctrine is not constrained to real-property transactions and the settlement offer was impliedly revoked when the offeror assigned the underlying judgment to a third party for collection and the assignee gave the offeree a copy of the assignment agreement before he accepted the settlement offer. We therefore reverse the court of appeals' judgment and render judgment that no contract to settle the debt was formed.

---

[2] *Id.* § 36.

[3] 199 S.W.2d 482, 485 (Tex. 1947).

2

## I. Background

In 2015, South State Bank (the Bank) domesticated a South Carolina judgment against Kyle Tauch for $4,635,877 plus interest. Subsequently, the Bank's senior vice president, James Holden, and Tauch began negotiating to settle the debt. Following a series of email exchanges over many months, Tauch offered the Bank $1 million to purchase the judgment.

With the debt having grown to more than $6 million, Holden responded to Tauch by email on April 11, 2016, rejecting his offer:

> I received word late Friday afternoon that the bank will not be able to accept your offer to sell your note/judgment or take a discounted settlement for the outright release price of $1M that you had offered. To assist you in understanding what amount the bank would be able to accept, I did ask for a counter figure and received authority to release your judgment for net proceeds of $2,000,000 which is still over a 50% discount. If you find that you and your investors can make this happen, please let me know as quickly as possible as the bank will likely be look[ing] at other collection alternatives.

Tauch did not immediately respond to the email.

As Holden's email implied, but unbeknownst to Tauch, the Bank was simultaneously pursuing alternative collection methods with another of Tauch's judgment creditors, Virginia Angel, trustee of The Gobsmack Gift Trust (Angel).[4] In an unrelated garnishment proceeding, Angel had secured a temporary restraining order prohibiting Tauch

---

[4] When negotiations commenced, the trust held a $613,541.46 judgment against Tauch that had been reduced to around $575,000 through its collection efforts.

from transferring, using, or disposing of funds held in several bank accounts and assets held in his name. In light of Angel's successes in locating, identifying, and freezing Tauch's assets, the Bank sought a strategic alliance with Angel to facilitate recovery on its own judgment.

On April 13, having received no response from Tauch, Holden executed, on the Bank's behalf, an agreement assigning the judgment to Angel for collection. As consideration for the assignment, the Bank would receive the first $3 million collected on the judgment with Angel retaining any additional sums collected. The agreement, which bore an April 14, 2016 effective date,[5] also included the following terms:

> In consideration of the substantial efforts by [Angel] to locate and identify assets of Tauch and to obtain the temporary restraining order, [the Bank] agrees to assign its judgment to [Angel] in accordance with the terms and conditions of this Agreement.

> Covenants and Agreements

> 1. [The Bank] assigns to [Angel] the [Bank's judgment] for purposes of collection.

> 2. The [Bank's] Judgment is transferred WITHOUT RECOURSE, REPRESENTATION OR ANY WARRANTY, EITHER EXPRESS OR IMPLIED, except as expressly set forth in paragraph 5 below.

> 3. [The Bank] hereby consents and grants permission to [Angel's] law firm . . . to take any and all necessary and appropriate steps to collect the [Bank's]

---

[5] Angel and the Bank subsequently signed a "Clarification of Assignment," which "clarified" that the parties intended the effective date to be April 13—the day the agreement was signed—not April 14. The clarified effective date is immaterial to our analysis.

4

Judgment . . . and hereby waives any potential or actual conflict of interest that may arise[.]

. . . .

5. [The Bank] warrants and represents to [Angel] that:

(a) [The Bank] is the present owner and holder of the [Bank's] Judgment and has not transferred or assigned its respective interests therein;

(b) No payment has been made on the [Bank's] Judgment through the date of this Agreement; and

. . . .

(e) [The Bank] agrees not to institute collection efforts on its own against Tauch utilizing or based upon any information obtained from [Angel] or her counsel.

6. [Angel] shall be fully and completely subrogated in and to all rights of [the Bank] relating to or arising from the [Bank's] Judgment[.]

. . . .

12. Either [Angel] or [the Bank] may terminate this Agreement at any time upon 45 days' written notice, but the confidentiality, non-disclosure and non-use provisions shall survive termination.

At 4:27 p.m. on April 13—the day both parties signed the agreement but before its stated effective date—Angel's attorney sent Tauch's attorney an email notifying him about the assignment and

demanding payment in full on the judgment. Confirming receipt of that email, Tauch's attorney requested documentation of the assignment, and shortly thereafter, at approximately 5:23 p.m., Angel's attorney forwarded a copy of the assignment agreement to him.

Recognizing this assignment as the "other collection alternatives" Holden had warned him the Bank would likely pursue, Tauch promptly emailed Holden at 6:12 p.m. on April 13 purporting to accept the settlement terms stated in Holden's April 11 email:

> I have spoken with my investors and they are OK with your offer. We agree to the 2 million payment which is a release and not a purchase. Please send paperwork so I can review.

Neither Holden nor any other Bank representative had informed Tauch about the assignment agreement prior to Tauch's attempted acceptance. Rather, all communications about the assignment agreement had come from Angel's attorney.

Two days later, the Bank's attorney responded to Tauch's email:

> Please be advised that, prior to its receipt of your email on Thursday morning, the [B]ank assigned its judgment. I understand your agent received notice [o]f this fact prior to your email to Mr. Holden and, based on the terms [of the assignment], you knew the [B]ank could not release the judgment when you sent the email.

Tauch denied that the purported settlement offer had been effectively revoked, insisted that a valid settlement agreement had been formed, and refused to pay Angel.

On April 25, 2016, Tauch's counsel acknowledged in a Rule 11 agreement that Angel's judgment had, at that point, been fully satisfied.

Nonetheless, given the percolating dispute over settlement of the Bank's judgment, the parties agreed to extend the temporary restraining order with a modification allowing Tauch to transfer $7 million from his bank accounts to his attorney's IOLTA account "to be held in trust for purposes of either transferring those funds into an escrow account . . . or paying off the balance of the [Bank's] judgment."

Less than a month later, Angel sued Tauch seeking a declaration that (1) Tauch's power of acceptance terminated on receipt of the assignment agreement; (2) Tauch's April 13 email came too late and was thus ineffective as an acceptance; (3) Tauch's April 13 email was not an acceptance because it lacked essential terms and contemplated further action; and (4) Tauch owed the full amount of the judgment, plus interest, to Angel. In a counterclaim, Tauch sued Angel for tortious interference with a contract and sought a declaration that he had a valid contract with the Bank to settle the debt for $2 million based on his acceptance of the Bank's April 11 offer before the assignment agreement's stated effective date. Tauch also filed a third-party claim against the Bank for breach of contract. The Bank responded with a counterclaim against Tauch, seeking a declaration that no contract was formed.

Angel and Tauch filed cross-motions for partial summary judgment on their declaratory-judgment claims. The trial court granted Angel's motion and implicitly denied Tauch's, concluding that "Tauch has no binding contract with [the] Bank to compromise and settle the Judgment" because (1) "Tauch's power of acceptance terminated by notice of and Tauch's receipt of the Assignment from [the Bank] to Angel" and (2) "[a]s a matter of law, Tauch could not have accepted the

7

offer made by the [Bank]." The court subsequently rendered final judgment for Angel and the Bank, holding (as the parties had agreed) that the declaratory-judgment ruling was dispositive of all parties and claims before the court. The final judgment also conditionally awarded attorney's fees to Angel and the Bank and, alternatively, to Tauch depending on the ultimate success of any appeals.

In a split decision, the court of appeals reversed and remanded.[6] Assuming, without deciding, that the implied-revocation doctrine is not limited to offers for the sale of the land, the court held that the doctrine's "elements are not satisfied under applicable case law or Restatement sections 42 or 43" because the assignment agreement was not "effective" before Tauch exercised the power of acceptance.[7] The court explained that Tauch's knowledge of the assignment agreement could not have effected an implied revocation of the Bank's April 11 settlement offer because "[t]he fact that the bank entered into an assignment agreement that would not take effect until April 14 is not an action that would prevent the bank's [offer] from materializing into a contract with Tauch should he accept the proposal before April 14, which he did."[8] This is so, the court said, because a "contract signed on April 13 but not effective until April 14 is no different than a contract signed on April 14 and

---

[6] 580 S.W.3d 808, 819 (Tex. App.—Houston [14th Dist.] 2019).

[7] *Id.* at 817 (referring to Angel and the Bank's reliance on Sections 42 and 43 of the *Restatement (Second) of Contracts* along with *Antwine*, 199 S.W.2d at 484, and *Kidwell v. Werner*, No. 10-05-00274-CV, 2006 WL 3627883, at *1 (Tex. App.—Waco Dec. 13, 2006, no pet.) (mem. op)).

[8] *Id.*

effective at its signing."[9] Concluding that Tauch still had the power of acceptance when he purported to accept the April 11 offer, the court held that Tauch and the Bank had a binding contract to compromise and settle the judgment for $2 million.[10] The court rendered judgment for Tauch on his declaratory-judgment claim and, in doing so, rejected arguments that Holden's April 11 email was not actually an offer and Tauch's April 13 email was substantively inadequate as an acceptance.[11]

In the dissent's view, the effective date of the agreement between the Bank and Angel was immaterial to whether the Bank's execution of it constituted a revocatory act.[12] The dissent warned that, by focusing on the effective date, the majority opinion had misstated and misapplied the implied-revocation doctrine.[13] "[T]he core inquiry," the dissent explained, is "whether the Bank took some action inconsistent with the offer to release the judgment in Tauch's favor . . . not whether Angel could enforce the assignment on April 13 or even whether the assignment had become executory," which it had.[14]

The dissent observed that *Antwine* had articulated the implied-revocation doctrine as effecting a revocation whenever the

---

[9] *Id.*

[10] *Id.* at 817-19.

[11] *Id.* at 813-14, 818-19.

[12] *Id.* at 822 (Frost, C.J., dissenting).

[13] *Id.* at 823 (stating that this Court's implied-revocation standard does not require "action that would prevent the offer from materializing into a contract").

[14] *Id.* at 822-23 (emphasis omitted).

offeree acquires "knowledge" that the offeror has taken "some act inconsistent with the offer."[15] The dissent further noted that the outcome in *Antwine* did not hinge on the existence of any other contract at all, as the offeree had only been told that the seller had taken the property off the market.[16] So regardless of "[w]hether the assignment's effective date was a day later, a week later, or a month later, agreeing to assign the judgment to Angel" surpassed the threshold set in *Antwine* because it "was an action inconsistent with releasing the judgment in Tauch's favor."[17] Because *Antwine* did not limit the implied-revocation doctrine "to any particular genre of cases," the dissent would have affirmed the trial court's judgment because the Bank impliedly revoked its offer and thereby terminated Tauch's power of acceptance before he attempted to accept the offer.[18]

On petition for review to this Court, the parties join issue on the scope and application of the implied-revocation doctrine and other asserted deficiencies in the requisites to contract formation. Because we hold that any offer had been impliedly revoked before Tauch accepted, we do not address the remaining contract-formation issues presented in the petition for review.

---

[15] *Id.* at 820-21 (citing *Antwine,* 199 S.W.2d at 485-86).

[16] *Id.* (noting that, in *Antwine,* an implied revocation occurred where the offeree had only been informed that the offeror had instructed his agent to take the property off the market).

[17] *Id.* at 822.

[18] *Id.* at 823.

## II. Discussion

## A. Applicable Standards

"A declaratory judgment granted on a traditional motion for summary judgment is reviewed de novo."[19] Summary judgment is proper when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law.[20] "When both sides move for summary judgment, and the trial court grants one motion and denies the other, reviewing courts consider both sides' summary-judgment evidence, determine all questions presented, and render the judgment the trial court should have rendered."[21]

Settlement agreements are contracts and are accordingly governed by contract-law principles.[22] Among the most foundational doctrines in the Anglo-American legal tradition is that an offer and an acceptance are two indispensable elements of a binding and enforceable contract.[23] But acceptance creates a binding contract only if the power of acceptance remains in the offeree.[24] If an offeror revokes an offer

---

[19] *Kachina Pipeline Co., Inc. v. Lillis*, 471 S.W.3d 445, 449 (Tex. 2015).

[20] *Id.*

[21] *Jefferson State Bank v. Lenk*, 323 S.W.3d 146, 148 (Tex. 2010) (internal quotation marks omitted).

[22] *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 513 (Tex. 2014).

[23] RESTATEMENT (SECOND) OF CONTRACTS §§ 17, 22.

[24] *See Antwine*, 199 S.W.2d at 485; RESTATEMENT (SECOND) OF CONTRACTS § 35 (an offer creates a continuing power of acceptance, but a contract cannot be created after the power of acceptance has terminated); 1 WILLISTON ON CONTRACTS §§ 5:1 (duration of offer), 5:2 (termination of power of acceptance) (4th ed. 2019).

before acceptance, the offeree's power of acceptance terminates.[25] Although there are exceptions,[26] most offers are revocable,[27] and all parties agree that if Holden's April 11 email to Tauch was an offer at all,[28] it was revocable.

Typically, a revocation will be communicated directly by the offeror to the offeree (or by and through agents of either).[29] A "direct communication" of the offeror's intention not to proceed with the contract will terminate the power of acceptance regardless of whether the retraction is made expressly or is implied from the offeror's words or actions.[30] But even when there has been no direct communication from offeror to offeree, the Restatement (Second) of Contracts recognizes that

[25] *See Antwine*, 199 S.W.2d at 485; RESTATEMENT (SECOND) OF CONTRACTS § 36(1)(c) (methods of terminating an offeree's power of acceptance include "revocation by the offeror"); 1 WILLISTON, *supra* note 24, § 5:2 (revocation is one of the primary means by which the power of acceptance created by the offer may terminate).

[26] *See, e.g.*, TEX. BUS. & COM. CODE § 2.205 (establishing requisites for a firm offer with respect to purchase or sale of goods); RESTATEMENT (SECOND) OF CONTRACTS § 37 (discussing option contracts supported by consideration).

[27] RESTATEMENT (SECOND) OF CONTRACTS § 42 cmt. a; *see also Bowles v. Fickas*, 167 S.W.2d 741, 743 (Tex. [Comm'n Op.] 1943).

[28] The court of appeals rejected Angel and the Bank's argument that the April 11 email was not an offer but rather an invitation to make an offer, and that holding has not been challenged in this Court.

[29] *See Antwine*, 199 S.W.2d at 485; RESTATEMENT (SECOND) OF CONTRACTS §§ 42 (discussing direct communication revocations), 43 cmt. a (describing a revocation communicated through a person having power to act for the offeror or offeree as a direct communication revocation governed by Restatement Section 42, as supplemented by the law of agency).

[30] *Antwine*, 199 S.W.2d at 485; RESTATEMENT (SECOND) OF CONTRACTS §§ 42 cmt. d ("[a]ny clear manifestation of unwillingness to enter the proposed bargain is sufficient"), illus. 1 & 5, Reporter's Note cmt. d.

an offer may be considered revoked if the offeree receives "reliable information" that the offeror has taken "definite action inconsistent with an intention to enter into the proposed contract."[31]  Section 43 of the Restatement refers to this as an "indirect communication of revocation" and states that the rule is an extension of "the principle [in Section 42] giving effect to a revocation communicated directly by the offeror to the offeree" and is "subject to the same qualifications."[32]

Although the offeror's actions may imply a revocation that has not been communicated in express words,[33] the revocation will not be effective unless the offeree has knowledge of those actions.[34]  Notice is

---

[31] RESTATEMENT (SECOND) OF CONTRACTS § 43.

[32] *Id.* § 43 cmt. a (describing Section 43's "indirect communication of revocation" rule as an extension of "the principle giving effect to a revocation communicated directly by the offeror to the offeree" that "is subject to the same qualifications"); *see also* 1 WILLISTON, *supra* note 24, § 5:10 ("It is now generally well settled that an offer may be revoked under some circumstances at least by knowledge on the part of an offeree that the offeror is no longer going to enter into such a contract as was proposed by the offer, although that knowledge comes not from the offeror or with his or her awareness, but through other channels.").

[33] The Second Restatement identifies *Dickinson v. Dodds*, 2 Ch. Div. 463 (1876), as a source for illustrations describing revocations implied by conduct in both Section 42, concerning direct communications, and Section 43, concerning indirect communications.  *See* RESTATEMENT (SECOND) OF CONTRACTS §§ 42 Reporter's Note cmt. d, 43 Reporter's Note cmts. b & c. *Dickinson* is "[t]he leading case" for indirect communication of an implied revocation.  1 WILLISTON, *supra* note 24, § 5:10.

[34] RESTATEMENT (SECOND) OF CONTRACTS §§ 42 cmt. b (emphasizing necessity that communication be received), 43 (requiring the offeror's knowledge of revocatory action); 1 WILLISTON, *supra* note 24, §§ 5:9 ("[T]he law of contracts ordinarily insists upon an objective rather than a subjective determination of whether mutual assent exists.  Therefore, ordinarily it is necessary for the offeror to communicate the revocation of an offer to the

essential.  Because an offeror's manifestations of intent are viewed under an objective standard,[35] the offeror's words and actions directly communicated to the offeree are reliable indicators of the intent so manifested.[36]  But if the same information comes to the offeree indirectly, the comments to Section 43 state that a revocation does not become effective unless a reasonable person acting in good faith would believe the information.[37]  Thus, "if the offeree disbelieves [a rumor] and is reasonable in doing so," the power of acceptance is not terminated "even though the rumor is later verified."[38]

Nearly 75 years ago, *Antwine v. Reed* set the standard in this state for an implied revocation directly communicated to the offeree. There, we approvingly quoted a compendium for the proposition that an offeree's knowledge that the offeror has undertaken "some act inconsistent" with an outstanding offer is sufficient to revoke the offer and "prevent an acceptance from changing into a binding contract."[39] We then held that the power of acceptance had terminated when a putative real estate purchaser learned from the seller's real estate

---

offeree."), 5:10 (recognizing that an offer may be revoked when the offeree's knowledge that the offeror is no longer minded to enter into the proposed transaction comes through channels other than the offeror).

[35] RESTATEMENT (SECOND) OF CONTRACTS § 42 cmt. b ("[T]he offeree is justified in relying on the offeror's manifested intention regardless of any undisclosed change in the offeror's state of mind.").

[36] *Compare id.* § 42, *with id.* § 43.

[37] *Id.* § 43 cmt. d.

[38] *Id.*

[39] *Antwine*, 199 S.W.2d at 485 (quoting 17 C.J.S. *Contracts*, § 50d).

broker that the seller had directed the broker to take the property off the market.[40]  *Antwine* is a direct-communication case involving a revocation implied by actions showing that the offeror had changed its mind.[41]  *Antwine* is our first and last word on implied revocation of an offer, so we have yet to consider an offeror's inconsistent conduct the offeree learns about indirectly.  Disputes involving indirect communication of revocatory conduct are said to "arise[] infrequently,"[42] and the near total jurisprudential silence on the implied-revocation topic since *Antwine*'s issuance appears to bear that out.

Here, all parties agree that this is not an express-revocation case because the Bank did not, by any words, retract its offer before Tauch's purported acceptance.  All parties also agree that this is not a

[40] *Id.* at 485-86.

[41] *See id.* at 485 (citing authority including the *Restatement (First) of Contracts* Section 41—the predecessor to Section 42 of the Second Restatement—which said "Revocation of an offer may be made by a communication from the offeror received by the offeree which states or implies that the offeror no longer intends to enter into the proposed contract, if the communication is received by the offeree before he has exercised his power of creating a contract by acceptance of the offer").

[42] 1 WILLISTON, *supra* note 24, § 5:10.  Texas intermediate court cases involving implied revocations acknowledge that such conduct may be communicated directly or indirectly without clearly involving communications of an indirect nature.  *See Wal-Mart Stores Tex. LLC v. Shirey*, No. 14-18-00545-CV, 2020 WL 548323, at *5 (Tex. App.—Houston [14th Dist.] Feb. 4, 2020, no pet.) (mem. op.) (holding that the trial court's granting of summary judgment was not revocatory conduct by the offeror and the offer did not specify it would be revoked if that event occurred); *Kidwell v. Werner*, No. 10-05-00274-CV, 2006 WL 3627883, at *3 (Tex. App.—Waco Dec. 13, 2006, no pet.) (mem. op) (finding some evidence of direct implied revocation); *Valencia v. Garza*, 765 S.W.2d 893, 896-97 (Tex. App.—San Antonio 1989, no writ) (mentioning revocations by direct and indirect communications without clearly articulating the case as falling under one or the other).

15

direct-communication case because Tauch learned about the assignment agreement from Angel's counsel, not the Bank, and neither Angel nor her attorney is alleged to have been acting as the Bank's agent on April 13 when counsel demanded payment on the judgment and forwarded the assignment agreement to Tauch's attorney.[43] The crux of the parties' dispute—and the dispositive issues—are whether the Bank's conduct in executing the assignment agreement with Angel impliedly revoked the April 11 settlement offer to Tauch and whether that information was communicated to Tauch in a legally cognizable manner before his purported acceptance.

### B. Implied-Revocation Doctrine

### 1. Parties' Arguments

Angel[44] asserts that the Bank's consummation of a deal to collect $3 million on the judgment met the standard for an implied revocation under both *Antwine* and the Restatement (Second) of Contracts because (1) execution of the assignment agreement was a definite and unequivocal action inconsistent with an intent to settle and release the debt for $2 million and (2) Tauch acquired reliable information about

---

[43] The assignment agreement arguably created an agency relationship between Angel's counsel and the Bank by virtue of a provision granting the Bank's consent and permission for Angel's law firm "to take any and all necessary and appropriate steps to collect the [Bank's] Judgment." Angel and the Bank do not claim an agency relationship with respect to the April 13 communications and state the contrary in briefing. To the extent the assignment created an agency relationship, which we do not consider, it would not have done so until the contract's stated effective date of April 14.

[44] Angel and the Bank are aligned in this proceeding and have filed joint briefing. Accordingly, in discussing the arguments on appeal, we refer to them collectively as Angel for convenience.

the Bank's inconsistent action no later than when he had the assignment agreement in hand. With both a clear manifestation of intent not to move forward with the settlement offer and Tauch's knowledge about the same, Angel contends that Tauch's power of acceptance terminated before he exercised it. Echoing the dissenting opinion below, Angel maintains that the contract's effective date does not compel a different result because the decisive criterion is inconsistency coupled with the offeree's knowledge of the inconsistency, both of which are satisfied on the undisputed facts here.

Tauch takes the position that (1) Texas does not recognize the implied-revocation doctrine; (2) even if it does, the doctrine only applies to offers for the sale or purchase of land; (3) if the doctrine is not limited to the real-estate context, the undisputed evidence negates an implied revocation because the assignment agreement's terms were not unequivocally inconsistent with the Bank's April 11 settlement offer; and (4) even if the Bank took inconsistent action, a reasonable person would not consider a third-party competitor's claims about the Bank's actions to be reliable enough to confer knowledge sufficient to effect a revocation. We reject Tauch's arguments.

Revocation by inconsistent action is firmly rooted in contract law without limitation to any specific contractual context. The touchstone of the doctrine is inconsistency, and that standard is met here. As explained below, the Bank's action in assigning the judgment to Angel for collection is, in the words of *Antwine*, "some act inconsistent" with the settlement offer[45] and, in the words of Sections 42 and 43 of the

---

[45] 199 S.W.2d at 485.

17

Restatement, a definite action inconsistent with an intention to enter the proposed settlement transaction.[46] The court of appeals' suggestion that only a presently enforceable contract would suffice is at odds with extant jurisprudence and learned treatises. While such a circumstance, if known to the offeree, would undoubtedly be sufficient to terminate the power of acceptance, our opinion in *Antwine* establishes that actions other than a preclusive alternative contract can suffice. Finally, although no revocation—express or implied—can be effective absent the offeree's knowledge of any such manifestation of intent, Tauch's receipt of the assignment agreement constitutes such notice. The assignment's transmission to Tauch by a third party—even one who is a competitor for the judgment—does not render it unreliable as a manifestation of revocatory intent where there is neither evidence nor argument impugning the assignment's authenticity. Whether a reasonable person would find statements made by Angel's counsel reliable or not, the document speaks for itself. In arguing that Texas has never recognized implied revocation, Tauch conflates indirect communication with implied revocation. A revocation implied by the offeror's actions may be

---

[46] RESTATEMENT (SECOND) OF CONTRACTS §§ 42 cmt. d (offeror need not expressly "revoke" an offer "[b]ut equivocal language may not be sufficient"), 43 & cmt. d (recognizing a valid revocation "when the offeror takes definite action inconsistent with an intention to enter into the proposed contract" but not when "the offeror takes no action or takes equivocal action"). *But see* 1 WILLISTON, *supra* note 24, § 5:8 (stating that "equivocal or inexplicit language . . . may not be sufficient to operate as a revocation [and whether it does] will ordinarily be a question of fact, depending upon what a reasonable person in the position of the offeree would have thought" but citing a case where the only fact issues concerned actual satisfaction of conditions precedent and whether the offeree had knowledge before acceptance that the offeror had contracted with another party to sell the same property).

communicated either directly from the offeror to the offeree, as *Antwine* affirms, or through other channels if the information about the offeror's actions is objectively reliable.

## 2. Doctrinal Applicability

The implied-revocation doctrine dates at least as far back as the classic English contracts case of *Dickinson v. Dodds*,[47] which recognized that an offer need not be expressly withdrawn or retracted to terminate the power of acceptance.[48] There, an offer to sell improved real property was outstanding with a stated expiration date that had not yet come to pass when the putative buyer learned from his agent that the putative seller had offered or agreed to sell the property to someone else.[49] How the agent had acquired this information was not disclosed,[50] but on learning about this development, the buyer promptly hand-delivered his written acceptance to the seller's abode and attempted to serve him with a duplicate as he entered a railway carriage.[51] Through these actions, the buyer endeavored to communicate his acceptance before the offer's stated expiration date.[52] When approached, the seller declined to take

---

[47] 2 Ch. Div. 463 (1876).

[48] *Id.* at 472.

[49] *Id.* at 464.

[50] *Id.* at 474 ("Then [the buyer] is informed by [his agent] that the property has been sold by [the seller to a third party]. [The agent] does not tell us from whom he heard it, but he says that he did hear it, that he knew it, and that he informed [the buyer] of it.").

[51] *Id.* at 464.

[52] *Id.*

the written acceptance, declaring: "You are too late.  I have sold the property."[53]

In adjudging the offer terminated before acceptance, Lord Justice James of the Court of Appeal in Chancery observed, "[T]here is neither principle nor authority for the proposition that there must be an express and actual withdrawal of the offer, or what is called a retraction."[54] And while "one man is bound in some way or other to let the other man know that his mind with regard to the offer has been changed, . . . in this case, beyond all question, the [buyer] knew that [the seller] was no longer minded to sell the property to him as plainly and clearly as if [the seller] had told him in so many words, 'I withdraw the offer.'"[55]  The buyer, "knowing all the while that [the seller] had entirely changed his mind," no longer had the power to accept the offer and no binding contract had come into being.[56]  The Restatement recognizes *Dickinson* as a case involving indirect communication of revocation under Section 43.[57]  Williston on Contracts describes *Dickinson* as "[t]he leading case" on indirect communication of revocation and notes that it "has generally been followed in the United States."[58]

Although *Dickinson* involved an offer to sell real property, the opinion does not suggest that the rule of implied revocation is limited to

---

[53] *Id.*

[54] *Id.* at 472.

[55] *Id.*

[56] *Id.* at 473.

[57] RESTATEMENT (SECOND) OF CONTRACTS § 43, Reporter's Note cmt. b.

[58] 1 WILLISTON, *supra* note 24, § 5:10.

that context. Rather, the analysis was rooted in the necessity of a meeting of the minds to form a binding contract.[59] To illustrate the point, Lord Justice Mellish, in announcing his agreement with the judgment, provided an example involving an offer to sell a particular horse where the offeror had, the next day, sold the horse to someone else.[60] Lord Justice Mellish found it "simply absurd" that if the offeree knows that the offeror "has sold the property to someone else, and that, in fact, he has not remained in the same mind to sell it to him, [that] he can be at liberty to accept the offer and thereby make a binding contract[.]"[61] *Dickinson* imposes no express constraint on the implied-revocation doctrine's application to real-estate transactions, and one cannot reasonably be inferred.

The same is true for *Antwine*. There, a bank had listed a parcel of land for sale with a real-estate broker.[62] The putative buyer, Reed, had authorized the bank's broker to make an offer to purchase the land on his behalf.[63] The bank, in turn, made Reed a written, signed counteroffer, which conditioned acceptance on an earnest-money deposit.[64] Before Reed had accepted the counteroffer by depositing the earnest money (an express condition of acceptance), the bank instructed

---

[59] *Dickinson*, 2 Ch. Div. at 473-75.

[60] *Id.* at 474-75.

[61] *Id.* at 474.

[62] *Antwine*, 199 S.W.2d at 483-84.

[63] *Id.* at 484.

[64] *Id.*

21

the broker to take the property off the market.[65]  After learning about the bank's instruction from the broker, Reed attempted to accept the counteroffer by depositing the earnest money.[66]  After articulating the principle that "'[f]ormal notice [of revocation] . . . is not always necessary, it being sufficient that the person making the offer *does some act inconsistent with it,*'"[67] we held that Reed's power of acceptance terminated when the broker told him that the bank had directed him to take the property off the market:

> According to the evidence the broker communicated with Reed concerning the transaction on or about the 27th or 28th of December, 1944, and advised Reed that the bank had directed him to take the land off the market.
>
> . . . .
>
> Thus it appears from the evidence offered by Reed that the proposal of the bank was never accepted in all of its terms by Reed until after Reed was advised of the bank's instructions to the broker to take the land off the market. Under the evidence stated and the authorities cited we hold that Reed had received notice of the bank's revocation of the proposed written contract before he had accepted it in all of its terms.  Accordingly, there was no contract to sell the land between the parties.[68]

Like *Dickinson*, *Antwine* is a real-estate case.  And also like *Dickinson*, it erects no barrier to the implied-revocation doctrine's

---

[65] *Id.* at 486.

[66] *Id.*

[67] *Id.* at 485 (emphasis added) (quoting 17 C.J.S. *Contracts* § 50d).

[68] *Id.* at 485-86 (recitation of the broker's trial testimony omitted).

application to contracts generally. Not by word or by analytical underpinning. In fact, it seems that no jurisdiction has limited the doctrine to offers involving the sale of land, and to the contrary, many have applied it outside of that context.[69] For its part, the Restatement

---

[69] *See USHealth Grp., Inc. v. South*, 636 F. App'x 194, 202-03 (5th Cir. 2015) (holding that no agreement to arbitrate was formed where the purported offeree "did not accept the offer" before the purported offeror impliedly "revoked any offer that could have existed" by filing suit (citing *Antwine*, 199 S.W.2d at 485)); *Varney Ent. Grp., Inc. v. Avon Plastics, Inc.*, 275 Cal. Rptr. 3d 394, 403 (Ct. App. 2021) (holding that a settlement offer was impliedly revoked by the offeror's inconsistent offer to enter into a stipulated judgment (citing RESTATEMENT (SECOND) OF CONTRACTS § 43)); *Lasco v. Town of Winfield*, 204 CV-467-PPS, 2007 WL 2349685, at *3 (N.D. Ind. Aug. 14, 2007) (holding that parties impliedly revoked their settlement offer prior to acceptance; although they never used words such as "withdrawn, revoked, or rescinded," "the[] facts clearly demonstrate[d] that . . . Plaintiffs manifested their unwillingness to enter into the[] proposed settlement agreement"); *see also Trs. of Teamsters Union Local No. 142 Pension Tr. Fund v. McAllister, Inc.*, 602 F. Supp. 2d 948, 955 (N.D. Ind. 2009) (noting, in analyzing whether the parties had a valid settlement agreement, that "[a]ny act or communication that would cause a reasonable person to believe that an offer has been withdrawn or revoked is sufficient to constitute a withdrawal or revocation of the offer (no specific words or magic words are necessary)" (citing 1 WILLISTON, *supra* note 24, § 5:8)); *Gabriel v. Alaska Elec. Pension Fund*, 3:06-CV-00192-TMB, 2008 WL 11284863, at *9 (D. Alaska Sept. 30, 2008), *aff'd*, 773 F.3d 945 (9th Cir. 2014) (citing RESTATEMENT (SECOND) OF CONTRACTS § 43 and holding offer to reinstate pension benefits was impliedly revoked by subsequent letter indicating offeror's determination that offeree was never entitled to benefits); *Abrams-Rodkey v. Summit Cnty. Child. Serv.*, 836 N.E.2d 1, 7 (Ohio Ct. App. 2005) ("A subsequent, inconsistent offer revokes an earlier offer. Thus, even if we find that the statement was intended to apply to all offers between SCCS and the union, a later, inconsistent offer—in this case, the offer to continue working—revokes the earlier offer." (citations omitted)); *Palmer v. Schindler Elevator Corp.*, 133 Cal. Rptr. 2d 339, 342 (Ct. App. 2003) (holding initial settlement offer was revoked by subsequent offer); *Wilson v. Sand Mountain Funeral Home, Inc.*, 739 So. 2d 1123, 1125 (Ala. Civ. App. 1999) (holding that an offer to buy stock was impliedly revoked by the offeror's service of a lawsuit on the offeree); *Norca Corp. v. Tokheim Corp.*, 227 A.D.2d 458, 458-59 (N.Y. App. Div. 1996) (holding that a subsequent offer to sell fuel pumps for a

23

acknowledges that the rule recognizing an indirect communication of an implied revocation "has been applied most frequently to offers for the sale of an interest in land," while simultaneously observing that the rule's animating principles are "equally applicable [but not limited] to offers to sell other specific property[.]"[70] We decline Tauch's invitation to limit the implied-revocation doctrine's application to certain transactions because no principle or authority supports doing so.[71] To the contrary, the necessity of a meeting of the minds is integral to the formation of any binding contract.[72]

---

different price impliedly revoked a prior offer); *Petterson v. Pattberg*, 161 N.E. 428, 429-30 (N.Y. 1928) (holding that an offer to settle existing mortgage at a discount with a lump-sum payment was revoked when the mortgagee sold the note to a third party and informed the principal about that transaction (citing *Dickinson v. Dodds*, 2 Ch. Div. 463 (1876))).

[70] RESTATEMENT (SECOND) OF CONTRACTS § 43 cmt. b; *see* 1 WILLISTON, *supra* note 24, § 5:10 ("The reported cases invariably involve land, though neither Restatement [First or Second] limits the application of the rule to offers to sell land."); RESTATEMENT (FIRST) OF CONTRACTS § 42 (AM. LAW INST. 1931) ("Where an offer is for the sale of an interest in land *or in other things*, if the offeror, after making the offer, sells or contracts to sell the interest to another person, and the offeree acquires reliable information of that fact, before he has exercised his power of creating a contract by acceptance of the offer, the offer is revoked." (emphasis added)).

[71] Tauch's only authority for a contrary proposition, *Winrow v. Discovery Ins. Co.*, No. COA06-1681, 2008 WL 565678, at *5 (N.C. Ct. App. 2008), cannot be read as proscriptively as he suggests. In that case, the court noted the absence of any North Carolina authority applying *Dickinson*'s rule outside the real-estate context and "decline[d] to extend" the rule "on the[] facts" of that particular case where the court had already determined that, as a threshold matter, there "was not a sufficiently definite action to revoke the [settlement] offer." *Id.*

[72] *See David J. Sacks, PC v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) ("A meeting of the minds is necessary to form a binding contract.").

That being the case, we turn now to the two essential components for a valid implied revocation: (1) inconsistent action and (2) communication. Both are in dispute here. The court of appeals disposed of the case on the ground that the Bank's conduct in executing the assignment agreement did not imply a revocation, so the court did not consider whether the method by which Tauch learned about it was sufficient to terminate the power of acceptance.

### 3. Action Inconsistent with Intent

In *Antwine*, the Court recognized the principle that the power of acceptance terminates when the offeree has knowledge that the offeror has undertaken "some act inconsistent" with the offer.[73] The opinion does not elaborate further. Sections 42 and 43 of the Restatement are comparatively more specific in requiring the offeror's actions to be definite and clearly inconsistent with an intent to proceed with the proposed bargain.[74] In describing "what constitutes a revocation," Section 42 states that "[a]ny clear manifestation of unwillingness to enter into the proposed bargain is sufficient. Thus a statement that property offered for sale has been otherwise disposed of is a revocation."[75] But objectively "equivocal" language may be insufficient

---

[73] *Antwine*, 199 S.W.2d at 485.

[74] RESTATEMENT (SECOND) OF CONTRACTS §§ 42, 43.

[75] *Id.* § 42 cmt. d; *see, e.g.*, *Normile v. Miller*, 326 S.E.2d 11, 18 (N.C. 1985) ("In this case, plaintiff-appellants received notice of the offeror's revocation of the counteroffer in the afternoon of August 5, when Byer saw Normile and told him, '[Y]ou snooze, you lose; the property has been sold.'"); *Bancroft v. Martin*, 109 So. 859, 860 (Miss. 1926) ("The contract for the sale of the land entered into by the Martins with Rennyson and Passera, which came to the knowledge of the appellant before he attempted to accept the Martins'

to effect a revocation[76] or may create a fact issue about "what a reasonable person in the position of the offeree would have thought."[77]

---

offer of sale, constituted a revocation thereof."); *Wm. Weisman Realty Co. v. Cohen*, 195 N.W. 898, 899 (Minn. 1923) ("We think that such offer, based upon no consideration, is revoked by a sale with notice."); *Watters v. Lincoln*, 135 N.W. 712, 715 (S.D. 1912) ("[P]laintiff should not be permitted to recover in this action for the reason that prior to the time he sent his night message of acceptance he was aware of the fact that defendant had sold and disposed of the land in question, thereby making it impossible for defendant to make a sale thereof to plaintiff."); *Thurber v. Smith*, 54 A. 790, 791 (R.I. 1903) ("The fact of a sale would show that the person giving the notice no longer had the power to carry out the offer. If such was not the purpose of the notice, it would be meaningless. We think that its purpose and effect was a revocation of the defendant's offer.").

[76] RESTATEMENT (SECOND) OF CONTRACTS § 42 cmt. d (stating that equivocal language "may not be sufficient"). *Compare Bovino v. Amazon.com, Inc.*, No. 13-CV-02111-MSK-MJW, 2015 WL 13612169, at \*2 (D. Colo. Sept. 15, 2015) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 42 illus. 4 (offeror's statement did not effect a revocation where it was "equivocal enough to suggest that the proposed bargain may yet be entered into"), *with Hoover Motor Express Co. v. Clements Paper Co.*, 241 S.W.2d 851, 853 (Tenn. 1951) (offer revoked where offeror's agent informed offeree that "he didn't think they were going through with the proposal. . . . That they had other plans in mind and he would let me know. He was not sure if he was going through with the original proposition."), *and* RESTATEMENT (SECOND) OF CONTRACTS § 42 illus. 5 (offer is revoked where offeror informs offeree "Well, I don't know if we are ready. We have not decided, we might not want to go through with it.").

[77] 1 WILLISTON, *supra* note 24, § 5:8 ("[I]f the offeror uses equivocal or inexplicit language, it may not be sufficient to operate as a revocation. Whether it has that effect will ordinarily be a question of fact, depending upon what a reasonable person in the position of the offeree would have thought." (citing *Stone Mountain Props., Ltd. v. Helmer*, 229 S.E.2d 779 (Ga. Ct. App. 1976), which held that whether the offeree knew that the property had been sold was a fact question, and other cases where no fact issue existed and revocation was determined as a matter of law)); *cf. BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 198, 202-03 (Tex. 2021) (applying an "unequivocally inconsistent" test with respect to implied ratification contrary to the express terms of the parties' existing contract and finding a fact issue

Section 43 similarly gives effect to "definite" action inconsistent with an intent to proceed with the offer, explaining that the rule "does not apply to cases where the offeror takes no action or takes equivocal action."[78] Examples of actions that are insufficient to revoke a prior offer are said to include "mere negotiations with a third person"; "a definite offer to a second offeree" that is consistent with an intent to honor the outstanding offer; and "[e]ven a binding contract with a third person [made] expressly subject to any rights arising under the outstanding offer."[79] The implied-revocation standard quoted in *Antwine* is not stated in such terms, but there, the offeror's actions (as reported to the offeree) would satisfy the Restatement's formulation because taking property off the

about intent to alter the parties' bargain arising from the party's objective manifestations of intent).

[78] RESTATEMENT (SECOND) OF CONTRACTS § 43 & cmt. d; *see* 1 WILLISTON, *supra* note 24, § 5:10 ("If the offeror has not in fact engaged in the reported conduct, or if the conduct engaged in is equally consistent with an intent to deal with the offeree as with some other individual, the offer is not deemed to be revoked.").

[79] RESTATEMENT (SECOND) OF CONTRACTS § 43 cmt. d; *see Nott v. Superior Ct.*, 204 Cal. App. 3d 1102, 1103 (Ct. App. 1988) ("Statements at an arbitration regarding the value and disposition of a case are directed to the resolution of the matter by an adjudication by the arbitrator. They do not address the resolution of the matter by contract. Hence, they manifest no intention to reject or revoke the outstanding section 998 offer. We see no inconsistency between continued contemplation of contractual resolution while putting one's best foot forward in the adjudicative proceeding."); *Mitchell v. Brimer*, 1987 WL 5319, at *3 (Del. Ch. Jan. 12, 1987) ("The mere fact that the seller is entertaining another offer, without more, will not give rise to a mandatory inference that the seller no longer intends to accept a potential buyer's then outstanding offer."); *S. Oil Co. v. Wilson*, 56 S.W. 429, 432 (Tex. Civ. App. 1900, no writ) (offeror's sale of its stock did not impliedly revoke offer to sell real and personal property because the stock sale did not divest the offeror of the title to the property, so no inconsistency existed).

27

market for sale is definite action clearly inconsistent with an intent to sell it.

Here, the Bank's agreement with Angel constitutes a revocatory act because it is "some act inconsistent" with the offer to release the judgment and is definite action clearly inconsistent with an intent to go forward with that offer. The court of appeals erroneously concluded that Tauch retained the power of acceptance because "an assignment agreement that would not take effect until April 14 is not an action that would prevent the bank's [offer] from materializing into a contract with Tauch should he accept the proposal before April 14."[80] The court's reliance on the agreement's effective date was misplaced for a couple of reasons. First, inconsistent action need not rise to the level of a binding contract with a third party to manifest revocatory intent. Second, the existence of such a contract, even executory in nature, suffices. The dispositive issue is not the offeror's *ability* to enter the proposed bargain but continued *willingness* to do so. Taking action that renders the offeror *unable* to consummate the deal obviously bears on *willingness* to do the deal, so a binding contract for the same subject matter may objectively speak to the offeror's intent. But so too could an *invalid* contract with a third party[81] or even actions without the existence of *any other contract at all.*[82]

---

[80] 580 S.W.3d at 817.

[81] *See Palmer v. Schindler Elevator Corp.*, 133 Cal. Rptr. 2d 339, 341-42 (Ct. App. 2003).

[82] *See, e.g.*, *Antwine v. Reed*, 199 S.W.2d 482, 485-86 (Tex. 1947) (offer to sell land was revoked by action of instructing real estate broker to take property of the market); *Norca Corp. v. Tokheim Corp.*, 227 A.D.2d 458, 458-59

The facts in *Antwine* are illustrative. There, although the offeror had indeed entered a contract to sell the property to a third party, the only information that had been communicated to the offeree was that the offeror had instructed his agent to take the property off the market.[83] Though not contractual in nature, we held that this action was sufficient to impliedly revoke the prior offer.[84] Importantly, taking the property off the market would not have prevented the offeror from honoring the offer, yet the power of acceptance terminated because that action manifested the offeror's intent not to sell the property to the offeree.

Another illuminating aspect of our analysis is the conclusion that, even though the bank's contract with the third party was executory in nature, the vendee could nonetheless enforce it against the bank's successor for specific performance:

> "One who, with knowledge, actual or constructive, of the
> executory contract acquires the legal title under or through
> a deed or mortgage executed by the vendor subsequently to

(N.Y. App. Div. 1996) (offer stating different terms of sale from original outstanding offer revoked the prior offer because the price terms were inconsistent); *Wilson v. Sand Mountain Funeral Home, Inc.*, 739 So. 2d 1123, 1125 (Ala. Civ. App. 1999) ("Sand Mountain's action in suing Wilson regarding his alleged wrongful acquisition of stock and intentional devaluation of stock constitutes a 'definite action inconsistent with an intention to enter into the proposed contract' [to purchase Wilson's stock shares for $25 each]. Thus, Wilson's power of acceptance was terminated when he was served with the lawsuit."(citations omitted)).

[83] *Antwine*, 199 S.W.2d at 484 & 486 (recounting that "[t]he first notice Reed had of the bank's revocation of its offer to him was communicated by the broker on or about the 28th day of December, 1944," which was to the effect that the "property was off the market").

[84] *Id.* at 486.

an executory contract for the sale of the land . . . , may be compelled, at the suit of the vendee under the executory contract, to perform the contract by conveying the legal title, if the conditions are such that such relief could have been granted against the vendor if he had not transferred the legal title."[85]

That is to say, even though the terms of the agreement contemplated future performance by one or both parties, it was nonetheless binding. By the same token, when a party binds itself to an executory contract with a future effective date, it is bound to that agreement.

Under our precedent, and as articulated in the Restatement, the relevant inquiry is not "whether the Bank took action that would prevent the offer from materializing into a contract" but whether "a reasonable person, in the position of the offeree, would regard the offer as withdrawn."[86] The focus is on the offeror's objective manifestations of intent.[87] Applying that standard to the undisputed facts in this case, the assignment agreement objectively manifests the Bank's intent to pursue other collection methods (as foreshadowed in Holden's April 11 email) instead of settling with Tauch and releasing the judgment. As

---

[85] *Id.* at 485 (quoting *Langley v. Norris*, 173 S.W.2d 454, 457 (Tex. 1943)).

[86] 1 WILLISTON, *supra* note 24, § 5:10.

[87] RESTATEMENT (SECOND) OF CONTRACTS §§ 42 cmt. b ("[T]he offeree is justified in relying on the offeror's manifested intention regardless of any undisclosed change in the offeror's state of mind."), 43 cmt. a (indirectly communicated revocation is subject to the same qualifications as a directly communicated revocation); 1 WILLISTON, *supra* note 24, § 5:9 ("[N]o case goes so far as to hold that a change of mind on the part of the offeror, not manifested by an overt act, will operate as a revocation.").

the dissenting justice below put it, "[w]hether the assignment's effective date was a day later, a week later, or a month later" is beside the point.

As an alternative to reliance on the contract's effective date, Tauch asserts that the Bank's action in contracting with Angel was not inconsistent with the April 11 settlement offer or was at least equivocal about the Bank's intent. As to that matter, Tauch argues that the assignment was not unequivocally inconsistent with the Bank's prior offer to him because the Bank could settle with Tauch and then unilaterally terminate the assignment agreement "at any time upon 45 days' written notice." The question, however, is not whether the Bank had the right to terminate the agreement but whether, by executing an agreement that was not terminable for at least 45 days, the Bank manifested an intent not to proceed with an offer that explicitly instructed Tauch to act "as quickly as possible" because "the bank will likely be look[ing] at other collection alternatives." If the Bank opted to terminate the assignment agreement and provided the required notice, it would excuse the parties' future performance, but the option to terminate, even if exercised at a future date, neither nullifies the agreement ab initio nor negates the Bank's present intent. On the day Tauch received the assignment agreement, it was a definite action clearly reflecting the Bank's intent to move forward with other collection alternatives, as Holden had advised Tauch it would do.

Of a similar nature is the assignment's provision making it "without recourse" against the Bank. Contract terms designed only to protect the Bank do not make the Bank's action equivocal.

Nor is the Bank's action equivocal merely because the assignment might not have been a better deal for the Bank, depending on what

31

Angel was able to collect from the frozen accounts. The Bank's motivation for—or prudence in—assigning the judgment is irrelevant. The bottom line is that agreeing to assign the judgment to a third party for collection is wholly inconsistent with offering to release the judgment against Tauch.

Tauch argues in rebuttal that the assignment agreement accords with all three of Section 43's examples of definite actions that are consistent with an outstanding offer. Comment d states:

> [M]ere negotiations with a third person, or even a definite offer to a second offeree, may be consistent with an intention on the part of the offeror to honor an acceptance by the original offeree. Even a binding contract with a third person may be expressly subject to any rights arising under the outstanding offer.[88]

With respect to the first example—"mere negotiations"—Tauch analogizes to *Mitchell v. Brimer*, a Delaware case in which the offeree was told that the offerors were engaged in "hot and heavy" negotiations with a third party and were "about to accept another offer[.]"[89] The offeree, however, had accepted the offer before learning that the offerors had come to an agreement with the third party.[90] The court held that the outstanding offer was not impliedly revoked merely on the offeree's knowledge that the offeror was negotiating with someone else because "[s]uch information could have reasonably been interpreted as a signal for [the offeree] to hurry up and accept the [offer]. It was hardly an

---

[88] *See* RESTATEMENT (SECOND) OF CONTRACTS § 43 cmt. d.

[89] 1987 WL 5319, at *2 (Del. Ch. Jan. 12, 1987).

[90] *Id.*

unambiguous message that the [offerors] had decided to terminate their negotiations with the [offeree]."[91]

The analogy to *Mitchell* is inapt. Tauch did not merely have notice that the Bank was engaged in negotiations to assign the judgment. To the contrary, he received a copy of the agreement—signed by the very person with whom he had been negotiating—assigning the judgment to Angel. Unlike the information in *Mitchell*, the assignment agreement could not have "reasonably been interpreted as a signal for [Tauch] to hurry up and accept the [offer]."[92] His argument to the contrary rests on assumptions that (1) only a binding contract can manifest revocatory intent and (2) the Bank was not bound to the assignment until its April 14 effective date. Both premises, as we have discussed above, are faulty.

Tauch's reliance on the Restatement's comment that a binding contract could be consistent with an outstanding offer is likewise misplaced. An example of such a situation is presented in *Southern Oil Co. v. Wilson*, in which the offeror company's sale of the majority of its stock—a definite action—was not inconsistent with its offer to sell certain property to the offeree.[93] The stock transaction was for an entirely different subject matter than the outstanding offer. Here, the assignment agreement specifically assigned the exact thing the Bank had previously offered to release. And although the assignment agreement did state that Angel would be "fully and completely

---

[91] *Id.* at *4.

[92] *Id.*

[93] 56 S.W. 429, 432 (Tex. Civ. App. 1900, no writ).

subrogated in and to all rights of [the Bank] relating to or arising from the" judgment, it said nothing about being subject to *a third party's* rights arising under an outstanding offer.

Even if the assignment did not transfer to Angel an exclusive right to enforce the judgment, as Tauch contends, the Bank's intent to collect on the judgment contemporaneously with Angel's collection efforts is definite and unequivocal action inconsistent with releasing the judgment in Tauch's favor.

If the relevant inquiry were whether the offeror's action would prevent the outstanding offer from materializing into a contract, the assignment's terms could arguably cause the assignment to be equivocal with respect to the Bank's intent to settle with Tauch. But that is not the standard. The question is whether the offeror acted inconsistently with the intent to honor the outstanding offer. As to that matter, the assignment agreement reflects the Bank's intent to do a different deal, with a different party, on different terms with respect to the same property. None of the assignment agreement's terms cause it to become anything less than an unequivocal action inconsistent with an intent to honor the Bank's previous settlement offer. As a matter of law, a reasonable person would understand the Bank's action in contracting with a third party to collect on the judgment to be a withdrawal of the settlement offer.

### 4. Communication

The mere fact that an offeror has engaged in definite action inconsistent with an intent to go forward with a prior offer is not alone sufficient to terminate the power of acceptance. No revocation can be effective unless the offeree has knowledge of it. Accordingly, when the

offeror engages in negotiations with multiple parties, the offeror takes the risk that more than one binding contract may be formed.[94] But if the offeror has manifested an unwillingness to enter into the proposed bargain and the offeree (or its agent) has acquired that information from the offeror (or its agent) before acceptance, the offer is revoked. That is the rule established by *Antwine*. Although this Court has not previously considered the validity of a revocation where the offeree acquired information about the offeror's change of mind through other channels, that rule is stated in *Dickinson*, memorialized in the current and former Restatements of contract law, and recognized by other contract treatises. While an indirect communication is amenable to a degree of uncertainty, the doctrine recognized by Section 43 of the Restatement and other treatises is defined by practical limitations that circumscribe its ambit.[95]

Tauch nonetheless asserts that, under Texas law, a revocation can (and should) preclude acceptance from forming a binding contract

---

[94] 1 CORBIN ON CONTRACTS § 2.20 ("It is not unusual for an owner to make several offers to sell specific property, even though the owner may know that there is a possibility that more than one will accept and more than one binding contract may be formed. In the desire to find at least one purchaser, the owner takes that chance.").

[95] *See* RESTATEMENT (SECOND) OF CONTRACTS § 43 (providing that an offer may be impliedly revoked by the offeree's receipt of reliable information from sources other than the offeror); RESTATEMENT (FIRST) OF CONTRACTS § 42 (same); 1 WILLISTON, *supra* note 24, § 5:10 ("It is now generally well settled that an offer may be revoked under some circumstances at least by knowledge on the part of an offeree that the offeror is no longer going to enter into such a contract as was proposed by the offer, although that knowledge comes not from the offeror or with his or her awareness, but through other channels."); *see also Normile v. Miller*, 326 S.E.2d 11, 18-19 (N.C. 1985) (holding offer was impliedly

only when information about the offeror's intent is communicated to the offeree directly by the offeror. In the alternative, he argues that if information about the offeror's actions can come from other sources, the information his agent acquired from Angel's counsel—a competitor for the judgment—was ineffective because it was unreliable as a matter of law. We hold that an indirect communication of revocatory action may be sufficient to terminate the power of acceptance, and in this case, the assignment agreement, which was the revocatory act itself, was—as a matter of law—reliable information of the Bank's intent not to settle the debt on the terms stated in Holden's April 11 email. Conveyance of the assignment agreement to Tauch's agent by a third party does not render it unreliable with respect to the inconsistency of intent that it plainly manifests.

"In the ideal world, a revocation when properly made should be as direct and explicit as an acceptance."[96] We must acknowledge, as does Williston's contract treatise, that there can be "theoretical and practical difficulties" with "allowing an effective revocation to be made by anyone other than the offeror."[97] In some cases, it may be difficult to determine, with sufficient clarity, that the offeror is no longer inclined to follow through with the offer.[98] But, the paucity of cases involving an indirect communication of revocation "suggest[s] that real difficulties

---

revoked when real estate agent, who represented offeree but not offeror, told offeree the property had been sold to someone else).

[96] 1 WILLISTON, *supra* note 24, § 5:8.

[97] *Id.* § 5:10.

[98] *Id.*

with the concept . . . are minimal."[99]  Moreover, "part of the basis for the doctrine is to prevent the unfairness inherent in allowing an offeree who no longer reasonably believes the offer to be open to snap it up, to the disadvantage of the offeror."[100]  That is precisely what happened here. As soon as the ink was dry on the assignment, Angel's counsel made its existence known, and recognizing the document's import (as a reasonable person would), Tauch quickly sought to snap up the Bank's offer before the assignment agreement's effective date.

While revocation by indirect communication may not have roots in Texas law, it is hardly novel.  Since *Dickinson*, treatises have recognized that the power of acceptance terminates when, by whatever means, the offeree receives objectively reliable information that the deal is off.  The standard being objective, it may give rise to questions about what "a reasonable person acting in good faith" would believe.  But in this case, the information Tauch secured was no mere rumor or unsubstantiated assertion of fact.  To the contrary, Tauch had in hand tangible evidence of the Bank's inconsistent action.  Whatever the outer reaches of the doctrine may be, the circumstances here fall squarely within it.

In today's world, the spread of information can be rapid-fire.  The policy reasons for recognizing the validity of an indirectly communicated revocation are even more compelling now than 175 years ago when *Dickinson* stated the rule.  Although the best—and usual—practice is for the offeror to communicate directly with the offeree, cabining the law

---

[99] *Id.*

[100] *Id.*

37

in such an absolute way is not pragmatic, realistic, or consonant with modern realities and foundational contract law.

### III. Conclusion

The Bank's agreement assigning the judgment to Angel was definite action inconsistent with its offer to Tauch to release the judgment. Tauch's receipt of reliable information about the assignment's existence and terms came from the agreement itself, impliedly revoking the Bank's offer and terminating Tauch's power of acceptance. Accordingly, the Bank and Tauch have no binding agreement to settle and release the judgment. We therefore reverse the court of appeals' judgment and render judgment reinstating the trial court's judgment.

John P. Devine
Justice

**OPINION DELIVERED:** January 14, 2022